# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. CR-06-11-P** |
| **CLONNIE ALONZO LAYMAN, et al.,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

The Defendant Clonnie Alonzo Layman was arrested by officers executing a search warrant on the premises of a travel trailer where he lived. He was thereafter indicted on a number of drug and gun charges stemming from incriminating evidence seized from his person and from the travel trailer and a mobile home located on the same property. *See* Docket No. 3. The Defendant sought suppression of this evidence and incriminating statements he made at the time of his arrest, and his Motion to Suppress Evidence and Statements [Docket No. 50] was referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Evidentiary hearings were conducted on March 27, 2006 and April 7, 2006, and the undersigned Magistrate Judge now recommends pursuant to 28 U.S.C. § 636(b)(1)(C) that the statements should be suppressed but the Motion to Suppress Evidence and Statements should otherwise be denied.

## A. Factual Background

Bobby Dale Kelley was wanted on drug charges in Rogers County. He failed to appear, so a warrant was issued for his arrest. His father owned property near Lake Tenkiller in Cherokee County, and the Rogers County Sheriff's Department heard Kelley might be staying in some sort of residence on the property. Rogers County notified the Cherokee County Sheriff's Department, and a SWAT team (consisting of three Cherokee County deputies and three agents of the Cherokee Nation Marshal Service) was sent to the location on August 25, 2003. The officers separated into two groups, one of which approached from a dirt road and the other from a utility easement. The property was so heavily wooded that the officers could not see a residence from the road, but they found a mobile home and a travel trailer close together in a clearing. The mobile home seemed vacant, *e. g.*, it was run down and had broken windows, but it appeared that someone was living in the travel trailer. The officers smelled an overpowering ammonia-type odor (so strong they could smell it from at least thirty yards away) that they associated with the manufacture of methamphetamine, and they observed several small burn piles containing items they likewise associated with the manufacture of methamphetamine, *e. g.*, lithium strips, empty ether cans and empty bottles of pseudoephedrine. The chemical odor grew even stronger as the officers approached the dwellings, and although the officers could not tell where it was coming from, the odor was so strong that the officers suspected there was an operating meth lab in the travel trailer or the mobile home. Fearing that someone inside might have been overcome by fumes, and that

an operating meth lab could explode and thereby endanger both the officers themselves and nearby residents, the officers decided to conduct a protective search of the premises. They knocked on the door of the travel trailer but received no answer, tried the door but found it locked, then finally gained entry simply by pulling on the door. There was not anyone inside, nor any meth lab, so the officers went to check the mobile home. Nobody answered at the front door (which was locked), so the officers went to the rear of the mobile home to check the back door. Here the chemical odor was nearly overwhelming, and the officers observed more items they associated with the manufacture of methamphetamine, *e. g.*, a bag of unused lithium batteries, some lithium batteries soaking in a solution and brass fittings on a water cooler that appeared to have been corroded by ammonia. The officers entered the mobile home through the back door and found no one inside, but they did find a meth lab (which was not "cooking" at the time) in plain view. The officers thereupon secured the premises and obtained a warrant to search the premises from the District Court of Cherokee County.

After the search warrant was issued, the officers searched the travel trailer in detail and seized incriminating evidence, including methamphetamine, drug paraphernalia, *e. g.*, a scales and some baggies, and an explosive device or "booby trap." They also found information connecting the Defendant to the travel trailer; until this time, the officers apparently still assumed the travel trailer was the residence of Bobby Dale Kelley, as is evidenced by the name on the state court search warrant. In the mobile home the officers found not only the meth lab (parts of which were in more than one room) but also materials

associated with the manufacture of methamphetamine, including anhydrous ammonia, pseudoephedrine, ether and various solvents, *e. g.*, acetone.

While the officers were executing the state court search warrant, the Defendant drove onto the property. By this time it was dark, and the area was illuminated by portable lights. The officers did not know who the Defendant was, *e. g.*, whether he was Bobby Dale Kelley, so they lined both sides of the driveway and met him with guns drawn. The Defendant was ordered out of his car and asked for identification. He presented a drivers license, which positively connected him with the travel trailer, and the Defendant was thereupon patted down for weapons. No weapons were found, but the Defendant did have a bulge in his left front pocket about the size of a racquetball. When asked what it was, the Defendant responded, "What do you think it is?" In reply to the suggestion that it was methamphetamine, the Defendant stated, "You might be right." The officer who patted down the Defendant thereupon removed a ball wrapped in blue shop towels and secured with black electrical tape. The ball proved to be approximately two ounces of methamphetamine. The Defendant was not formally arrested or advised of rights under *Miranda v. Arizona,* 384 U.S. 436 (1966) until later, although it is clear that he was not free to leave the scene once the officers discovered his connection to the travel trailer.

## B. Analysis

The Motion to Suppress Evidence and Statements addresses two categories of evidence: (i) evidence seized from the Defendant's property under the state court search

warrant; and, (ii) evidence obtained from the Defendant in the encounter with the officers executing the state court search warrant, *i. e.*, the methamphetamine found on the Defendant's person and the statements he made in connection therewith. The undersigned Magistrate Judge finds that the Defendant's statements should be suppressed, but the Motion to Suppress Evidence and Statements should otherwise be denied.

## 1. The evidence seized under the state court search warrant.

The Defendant raises a number of Fourth Amendment issues regarding the validity of the state court search warrant: (i) whether the officers unconstitutionally invaded the Defendant's property in the first instance; (ii) whether the officers' initial intrusion into the travel trailer and the mobile home without a warrant was unconstitutional; and, (iii) whether the state court search warrant was invalid because the information included in the underlying affidavit failed to establish probable cause, or because material information was intentionally omitted therefrom.[1] The undersigned Magistrate Judge finds that the information underlying the search warrant was lawfully obtained, that there was probable cause for issuance of the search warrant and that the evidence seized thereunder need not be suppressed.

---

[1] The Defendant also contends that because the officers intentionally omitted material information from the search warrant affidavit, they could not have executed the search warrant in good faith. As is discussed below, probable cause supported the issuance of the search warrant. Accordingly, there is no need to address the "good faith exception" set forth in *United States v. Leon,* 468 U.S. 897 (1984). *See United States v. Colonna,* 360 F.3d 1169, 1173 (10th Cir.) ("Because the affidavit here supports a finding of probable cause despite its 'numerous falsehoods,' it also supports a probable cause finding on its face, and it is not necessary to apply the good faith exception."), *cert. denied,* 543 U.S. 823 (2004).

First, the officers' initial entry onto the Defendant's property without a search warrant was justified by the "open fields" doctrine. *See, e. g., United States v. Hatfield,* 333 F.3d 1189, 1197-98 (10th Cir. 2003) ("[T]he police can enter open fields at any time for investigative purposes without violating the Fourth Amendment."), *citing United States v. Pinter,* 984 F.2d 376, 379 (10th Cir.1993) ( "The open fields doctrine does not require that law enforcement officials have some objective reason--either probable cause or reasonable suspicion--before entering an open field."). *See generally Oliver v. United States,* 466 U.S. 170, 181 (1984) ("We conclude, from the text of the Fourth Amendment and from the historical and contemporary understanding of its purposes, that an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers."), *citing Hester v. United States,* 265 U.S. 57 (1924) ("[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law."). This is true even though the Defendant's property was heavily wooded and could not be observed from the road. *Pinter,* 984 F.2d at 379 ("The fact that the property may not have been 'open' in the sense that the area was wooded and the laboratory location was not visible from a public place likewise is of no significance."), *citing Oliver,* 466 U.S. at 180 n. 11 ("It is clear, however, that the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech . . . a thickly wooded

area nonetheless may be an open field as that term is used in construing the Fourth Amendment."), *citing United States v. Pruitt,* 464 F.2d 494 (9th Cir. 1972).

Second, the officers' initial entry into the travel trailer and the mobile home without a search warrant was not unlawful. The officers' first smelled what they reasonably thought was an operating methamphetamine lab from outside the curtilage of the Defendant's home, *i. e.*, they detected an overpowering chemical odor they associated with the manufacture of methamphetamine from at least thirty yards away, even before they could see the travel trailer or the mobile home. *See, e. g., United States v. Hatfield,* 333 F.3d 1189, 1197-98 (10th Cir. 2003) ("If the investigators had physically breached the curtilage there would be little doubt that any observations made therein would have been proscribed. But observations from outside the curtilage of activities within are not generally interdicted by the Constitution."), *quoting Fullbright v. United States,* 392 F.2d 432, 433-35 (10th Cir.1968). *See generally United States v. Dunn,* 480 U.S. 294, 304 (1987) ("Under *Oliver* and *Hester*, there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields. Similarly, the fact that the objects observed by the officers lay within an area that we have assumed, but not decided, was protected by the Fourth Amendment does not affect our conclusion."). They also observed items they associated with the manufacture of methamphetamine in burn piles and elsewhere. These observations established exigent circumstances and justified the officers' warrantless entry into the travel trailer and the mobile home to protect the public and themselves. *See generally United States*

*v. Wicks*, 995 F.2d 964, 970 (10th Cir. ("[O]fficers may . . . conduct a warrantless search if they believe that their own lives or the lives of others are at risk."), *citing Warden v. Hayden,* 387 U.S. 294, 298-99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."). *See also United States v. Smith,* 797 F.2d 836, 840 (10th Cir.1986) ("The basic aspects of the 'exigent circumstances' exception are that (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched."). The danger associated with an operating methamphetamine lab is a well-established example of such exigent circumstances. *See, e. g., United States v. Rhiger*, 315 F.3d 1283, 1289-1291 (10th Cir. 2003), *citing United States v. Wilson,* 865 F.2d 215, 216-17 (9th Cir. 1989) (strong smell of chemical fumes, activity in suspected methamphetamine lab, and liquid ether spilling out of same space substantiated officer's fears regarding public safety and warranted his entry into garage); *United States v. Spinelli,* 848 F.2d 26, 29-30 (2nd Cir. 1988) (police knowledge of volatile nature of methamphetamine, and fear that defendant would try to destroy evidence by causing explosion in lab, established exigent circumstances); *United States v. Brock,* 667 F.2d 1311, 1314-15 (9th Cir. 1982) (smell of cooking methamphetamine and officer's observation of defendant choking on fumes supported officer's fears of

potential explosion and justified warrantless entry into mobile home); *United States v. Erb,* 596 F.2d 412, 417-18 (10th Cir.), *cert. denied,* 444 U.S. 848 (1979) (strong smell of ether emitting from house for over six hours, reliable tips from informant, and officer's fear that defendant might try to destroy evidence and that methamphetamine lab could cause danger to public, established exigent circumstances allowing warrantless entry of dwelling). *See also United States v. Walsh*, 299 F.3d 729, 734 (8th Cir. 2002) ("The potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an on-going methamphetamine manufacturing operation. Here, the strong smell of ether and the equipment and residue found in the carport area suggested on-going manufacture in the shed. Officer Cantrell could not be certain no one was hiding (or worse yet, lying unconscious) in the shed, and Officer McPhail was justified in verifying that no untended heat source was creating an imminent risk of fire or the explosion of volatile chemicals."). Significantly, there is *no* indication the officers entered either dwelling to investigate crimes, seize evidence or effect an arrest; after confirming there was no operating methamphetamine lab (and no one in need of assistance), the officers secured the premises and obtained the state court search warrant. *See Rhiger,* 315 F.3d at 1290 ("There is also no evidence the agents entered the home with an intent to arrest and seize evidence. Rather, as discussed above, they were motivated out of a concern for public safety . . . Only after the agents detained defendants, turned off the heat, and obtained a search warrant, did they

re-enter the premises and conduct a full and thorough search."); *Walsh,* 299 F.3d at 734

("Officer Cantrell looked around the shed from the entrance and then shut the door. Officer

McPhail confirmed there seemed to be no imminent risk of fire or explosion and then

obtained a warrant before investigating the lab more thoroughly and eliminating its less

immediate threat to public safety. Thus, viewed in their totality, the officers' actions

complied with the Fourth Amendment standard of reasonableness.") [citations omitted].[2]

The officers' initial intrusion into the travel trailer and the mobile home without a search

warrant was therefore not unlawful.

Third, the state court search warrant was supported by probable cause. As the

foregoing discussion demonstrates, *any* information the officers learned while on the

Defendant's property was lawfully obtained, and thus could have been used in obtaining the

state court search warrant. The officers did not, however, use all of this information; the only

evidence cited in the search warrant affidavit was what was observed outside the travel trailer

---

[2] The officers' expressed justification for initially being on the Defendant's premises was to try to arrest Bobby Dale Kelley on an outstanding warrant. They did not, however, enter the travel trailer or the mobile home on this authority; their mission changed when they became concerned there was an operating methamphetamine lab in one of the dwellings. This is significant because the officers apparently could not have entered the travel trailer or the mobile home simply to arrest Bobby Dale Kelley; while there was evidence that the officers had reason to believe he was living on the property, there was no evidence to suggest he was *actually in* the travel trailer or the mobile home at the time. *See, e. g., United States v. Gay,* 240 F.3d 1222, 1226 (10th Cir. 2001) ("In a *Payton* analysis, this court recognizes a two-prong test: officers must have a reasonable belief the arrestee (1) lived in the residence, and (2) *is within the residence at the time of entry*.") [emphasis added], *citing Valdez v. McPheters,* 172 F.3d 1220, 1224-25 (10th Cir.1999). *See generally Payton v. New York,* 445 U.S. 573, 603 (1980) ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.").

and mobile home, *i. e.*, the overpowering ammonia smell, the lithium batteries (some soaking in solution and some not) and the items found in burn piles. Nor did the officers advise the state court judge in the search warrant affidavit that they had already been inside the dwellings. Two questions thus arise: (i) whether the information actually provided to the state court judge establishes probable cause to search the travel trailer and the mobile home; and, (ii) whether any information withheld from the state court judge invalidates the search warrant.[3] The answers to these questions are respectively "yes" and "no."

Clearly, there was enough information contained in the search warrant affidavit to establish probable cause to search the travel trailer and the mobile home for evidence of a methamphetamine lab. Given the experience and training of the officers involved, the detection of a strong odor commonly associated with the manufacture of methamphetamine was arguably sufficient in and of itself to establish probable cause. *See, e. g., United States v. Windrix,* 405 F.3d 1146, 1152 (10th Cir. 2005) ("[T]he scent of methamphetamine, wherever detected, gives qualified officers probable cause to search for methamphetamine and evidence of methamphetamine manufacturing."). In any event, there was substantial additional evidence, such as the lithium batteries and the burn piles containing, *inter alia*, empty ether cans, empty pseudoephedrine containers and a syringe.

---

[3] It would appear that what the Defendant *really* contends is that the search warrant is invalid simply because the officers unlawfully entered the travel trailer and the mobile home prior to obtaining it. However, as discussed above, officers' warrantless entry into the dwellings was not unlawful. But even if it was, none of the information they obtained while inside was cited in the search warrant affidavit. *See, e. g., Hester,* 265 U.S. at 57 ("This evidence was not obtained by the entry into the house and it is immaterial to discuss that.").

Further, the search warrant was not invalidated by the failure to include in the affidavit any information that would have revealed to the state court judge that the officers had already been inside the travel trailer and the mobile home. The failure to include such information in the search warrant affidavit would violate the Fourth Amendment *only if* it vitiated probable cause. *See, e. g., Stewart v. Donges*, 915 F.2d 572, 583 (10th Cir. 1990) ("Not every omission of relevant information will be regarded as 'material.' The omitted information must be so probative as to negate probable cause."). *See also United States v. Knapp,* 1 F.3d 1026, 1029 (10th Cir. 1993). Here, the omitted information, *e. g.*, that methamphetamine and other evidence had been found in the travel trailer, and that a methamphetamine lab had been found in the mobile home, would actually support, not vitiate, a probable cause finding. The undersigned Magistrate Judge therefore need not consider whether any omission was done "knowingly and intentionally, or with reckless disregard for the truth[.]" *Franks v. Delaware*, 438 U.S. 154, 155 (1978). *See also United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000) ("[T]he standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods.").

In summary, the information contained in the search warrant affidavit was lawfully obtained and provided probable cause for issuance of the state court search warrant. Accordingly, the evidence seized under the search warrant was likewise lawfully obtained, and suppression of such evidence is therefore inappropriate.

## 2. The evidence obtained from the Defendant
### during the execution of the state court search warrant.

The Defendant also contends that the evidence obtained during his encounter with the officers executing the search warrant should be suppressed, *i. e.*, that he was questioned without benefit of *Miranda* warnings and made incriminating statements, and that he was unlawfully searched, which revealed methamphetamine on his person. The undersigned Magistrate Judge finds that the statements should be suppressed, but the methamphetamine should not.

As discussed above, the Defendant arrived on the scene while the officers were executing the state court search warrant on his property. The officers did not know who the Defendant was, or why he had shown up. The Defendant was therefore subject to an investigatory stop and pat-down for weapons pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). Further, once the Defendant was connected to the incriminating evidence found travel trailer, there was probable cause for his arrest. What is unclear, however, is exactly when the Defendant was arrested, *i. e.*, at what point did his investigatory detention became a custodial arrest.

It is tempting to conclude that the Defendant was not yet in custody when he made the incriminating statements about having methamphetamine on his person. This would obviate any concern about the lack of *Miranda* warnings (although not about lack of voluntariness), as only custodial interrogation triggers the need for such warnings. *See, e. g., United States v. Salinas-Calderon,* 728 F.2d 1298, 1302 (10th Cir. 1984) ("The male passengers were not

subjected to custodial interrogation which triggers the *Miranda* requirement."), *citing Miranda,* 384 U.S. 436 at 477-78. Indeed, the questioning came very early in the encounter, while the Defendant was being patted down for weapons, by an officer who did not arrest him (and did not know who did), before he was handcuffed and undeniably before there was any *formal* arrest. *See, e. g., United States v. Edwards,* 103 F.3d 90, 93 (10th Cir. 1996) ("The district court also correctly noted that "[l]ength of time is the most important consideration in determining whether a restraint is a stop or a full-fledged arrest.") [citations omitted]. Nevertheless, the undersigned Magistrate Judge finds that the questioning of the Defendant *was* a custodial interrogation. The officer who patted the Defendant down and questioned him about the bulge in his pocket regarded him as being under arrest as soon as he was connected to the incriminating evidence in the travel trailer. More to the point, it seems clear that "from an objective viewpoint, someone in [the Defendant's] position would reasonably believe [his] freedom of action had been curtailed to a 'degree associated with a formal arrest[.]'" *United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir.1993), quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983) *and Berkemer v. McCarty,* 468 U.S. 420, 440 (1984) [footnote omitted]. Upon arriving at his home after dark, the Defendant found his property illuminated by lights and occupied by police, who ordered him out of his car at gunpoint, connected him to incriminating evidence found in his residence (*i. e.*, the travel trailer), thoroughly searched him for weapons and ultimately seized the methamphetamine. Although no one advised the Defendant he was under arrest, it is difficult to imagine him

thinking otherwise in such a "police dominated atmosphere." *See Griffin,* 7 F.3d at 1518 ("A final factor commonly examined is the circumstances showing a "police dominated" atmosphere."), *citing Berkemer,* 468 U.S. at 439, and *Miranda,* 384 U.S. at 445.

Because the officers' questioning of the Defendant about the bulge in his pocket was a custodial interrogation, the Defendant was entitled to receive *Miranda* warnings. It is undisputed that he did not. Accordingly, his incriminating statements about the bulge, *i. e.*, "What do you think it is?" in response to being asked what it was, and, "You might be right" in response to the suggestion that it was methamphetamine, must be suppressed. *E. g., Griffin,* 7 F.3d at 1519.

The same cannot be said, however, for the methamphetamine found on the Defendant's person. The officers were not entitled to seize the methamphetamine in the context of a *Terry* stop because they did not reasonably believe that it was a weapon. *See, e. g., Minnesota v. Dickerson*, 508 U.S. 366, 368 (1993) ("Here, the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to '[t]he sole justification of the search [under Terry: ] the protection of the police officer and others nearby."), *quoting Terry,* 392 U.S. at 29. However, the Defendant was either under arrest at the time, or he was arrested shortly thereafter, because of his connection to the evidence found in the travel trailer and the mobile home; the search of the Defendant's person and the seizure of the methamphetamine was therefore justified as being incident to his arrest. *See, e. g., United States v. Anchondo,* 156 F.3d 1043, 1045 (10th Cir.1998). ("A

warrantless search preceding an arrest is a legitimate 'search incident to arrest' as long as (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search."). *See generally Rawlings v. Kentucky,* 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."). Although the Defendant *was* arrested at least in part for possession of the methamphetamine found in his pocket, it is significant that this was not the sole reason for his arrest. *See Rawlings,* 448 U.S. at 111, n. 6 ("The fruits of the search of petitioner's person were, of course, not necessary to support probable cause to arrest petitioner."). This evidence should not be suppressed.[4]

### C. Conclusion

In summary, the undersigned Magistrate Judge finds: (i) that the entry of the law enforcement officers onto the property where the Defendant's travel trailer and the mobile home were located was not unlawful; (ii) that the warrantless initial entry into the mobile home and travel trailer was legal, based on exigent circumstances; (iii) that all of the information contained in the state court search warrant was lawfully obtained and provided probable cause to search the travel trailer and the mobile home; (iv) that the questioning of

---

[4]    Apparently the officers also searched the Defendant's vehicle and seized evidence found therein. This was likewise justified as a search incident to the Defendant's arrest. *New York v. Belton,* 453 U.S. 454, 460 (1982) ("[W]e hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.") [footnotes omitted]. Any evidence seized from the Defendant's vehicle should therefore not be suppressed.

the Defendant after his arrival on the scene was a custodial interrogation, that he was not given *Miranda* warnings and that his statements about the bulge in his pocket should therefore be suppressed; and, (v) that the search of the Defendant's person and the seizure of the methamphetamine found in his pocket were justified as incident to his arrest. Accordingly, the undersigned Magistrate Judge RECOMMENDS that the Motion to Suppress Evidence and Statements should be GRANTED to the extent that the Defendant's statements should be suppressed but otherwise DENIED.

The parties are hereby given ten (10) days from the date of the service of this Report and Recommendation to file with the court clerk any objections, with supporting briefs. Failure to object to this Report and Recommendation within ten (10) days will preclude appellate review of the judgment of the District Court based on such findings.

**IT IS SO ORDERED** this __19th__ day of April, 2006.

_____
**Steven P. Shreder**
**UNITED STATES MAGISTRATE JUDGE**